**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

|                               |   |                  |
|-------------------------------|---|------------------|
| JODIE ROSS,                   | : |                  |
|      Plaintiff,               | : |                  |
|                               | : |                  |
|      v.                       | : | No. 2:04-CV-103  |
|                               | : |                  |
| INTERNATIONAL BUSINESS        | : |                  |
| MACHINES CORP.,               | : |                  |
|      Defendant.               | : |                  |
|                               | : |                  |

### OPINION AND ORDER

In this diversity action, Plaintiff Jodie Ross seeks damages for wrongful termination and sex discrimination after being terminated by Defendant International Business Machines Corp. ("IBM"), which accused her of lying to an auditor and falsifying a document.  Ross moves for default judgment based on alleged spoliation of evidence by IBM.  IBM moves for summary judgment. For the reasons stated below, Ross's motion for default judgment (Doc. 17) is DENIED.  IBM's motion for summary judgment (Doc. 18) is GRANTED in part and DENIED in part.

### I. BACKGROUND

Except where otherwise indicated, the facts set forth below are undisputed.  Jodie Ross began working for IBM in 1981, and she transferred to its Essex Junction, Vermont facility in 1993. By 2004, she had attained a managerial position in IBM's Systems and Technology Group and was responsible for overseeing the Product Crib, which housed inventory with a value in excess of

300 million dollars.  Prior to 2004, Ross had received a series of positive job evaluations.  Her evaluations for various periods between 1993 and 2003 indicated that she had "achieved/exceeded commitments"; that she was a "superior contributor"; and that her "overall job contribution was extraordinary."  IBM's Answers to Pl.'s First Interrogs. ¶ 6, Ex. 1 to Mot. for Default J. (Doc. 17).

**A. <u>IBM's internal audit and Ross's creation of an allegedly falsified document</u>**

In January 2004, IBM conducted an internal corporate audit at the Essex Junction facility.  The audit involved a review of the inventory management processes in Ross's Product Crib and in the Non-Product Crib, a separate inventory area that was managed by Frank Antonucci.  The auditor, Scott Layton, met with Antonucci and asked him for a summary or other documentation of the procedures he followed when conducting investigations of inventory discrepancies.  Antonucci did not have a pre-existing document containing that information, so after meeting with Layton, he created a document outlining a checklist of the procedures that he and his staff followed in such investigations. He dated the document with the current date and presented it to Layton.

Layton then met with Ross and her department's Business Controls liaison, Elizabeth Kohler.  Layton asked for the same type of documentation he had requested from Antonucci,

2

summarizing the procedures that Ross and her staff followed in
conducting investigations of inventory variances.  Like
Antonucci, Ross did not have a pre-existing document with that
information, and she returned to her office with Kohler to create
one.  She reviewed her files to determine what practices had been
followed in the past and compiled a checklist summarizing those
practices.  Unlike Antonucci, however, Ross did not place the
current date on her document.  Instead, she wrote three dates,
one each from the years 2002, 2003, and 2004, and signed her name
next to each date.  She then gave the document to Kohler with
instructions to pass it on to Layton.

The question of what Ross intended to signify by including
three different dates and signatures is of critical importance in
this case.  After the incident came to light, IBM ultimately
concluded that Ross had signed with different dates in order to
mislead Layton into thinking that the checklist had existed
during the years indicated and that it was not a recent creation.
In reaching this conclusion, IBM relied primarily on allegations
made by Kohler, who was the only other employee who took part in
the creation of the document.  According to Kohler, when Layton
asked for the document, Ross told him that she had it back in her
office.  Kohler states that after leaving the meeting, she told
Ross that no such document existed, and Ross responded, "No, and
you're going back to my office now and we're going to create it."

3

Aff. of Elizabeth Kohler ¶ 10, Ex. J to Mem. in Support of Mot.
for Summ. J. (Doc. 19).  Kohler further alleges that when Ross
signed and dated the document, she used three different colors of
ink in order to reinforce the false impression that the document
had been created years earlier and signed and dated on three
separate occasions.

   Ross, however, disputes Kohler's allegations and contends
that she had no intention of being misleading.  See Tr. of Dep.
of Jodie Ross at 35-46, Ex. A to Doc. 19. (hereinafter Ross Dep.)
She states that she had preexisting documents in her files to
support the information summarized in the document, and that only
the checklist itself was newly created.  Her explanation for
signing with three different dates is that she intended to
certify that the policies had been in effect and had been used
for audits in the months and years indicated.  She denies signing
in three different colors.  As Ross explained at her deposition:

>     A: I wrote up a blank checklist for all the information
>     that was, that I already had in my file.  Each individual
>     revolving inventory count had all of the information that
>     is required within this checklist that had been produced.
>     Q: Okay.  Did you have a checklist before you created the
>     bullet form?
>     A: No.
>
>     . . .
>
>     Q: Why did you sign the checklist?
>     A: To show that I have the information on file that showed
>     exactly what the checklist consists of.
>     Q: Okay, you said to show that you have that information
>     on file; what information?
>     A: The information of that checklist shows the process and

procedures that reflected that I have all the information
within that file for those dates.
Q: And what dates were those?
A: 2002, 3, and 4.
Q: How many times did you sign--
A: Three.
Q: --the checklist?  Why did you sign three times?
A: Showing that I had the policies in effect and charts
and backup information for those three consistent dates.
Q: When you signed it, did you also date the form there
times?
A: Yes, I did, to show the information for that year I had
on file.
Q: When you signed three times, did you use three
different pens?
A: No.

Id. at 41-42.

Ross denies telling Layton that she had the document back in
her office.  In fact, she contends, it was not clear that Layton
was seeking a pre-existing document at all, and she simply told
him that she would have to go back to her office to review her
files.  Ross also denies having a conversation with Kohler after
the meeting on the way back to her office.

## B. IBM's destruction of the document

The precise contents and layout of Ross's document are
unknown to us, because it was destroyed by IBM shortly after its
creation.  After receiving the document from Ross, Kohler did not
submit it to Layton to review.  Instead, she contacted two other
employees, Margaret Norton and Sharon Lockwood, who in turn
contacted Ross's manager, Don Tillson.  Together, Kohler, Norton,
Lockwood, and Tillson decided that use of earlier dates in the
document was misleading and that the document should not be given

5

to an auditor.  Tillson created a substitute document, dated with the current date, for submission to Layton.

After creating the substitute document, Norton, Lockwood, and Tillson made a joint decision that Ross's original document should be destroyed.  Norton and Tillson testified at their depositions that their motive in deciding to destroy the document was to ensure that it would never reach Layton and raise the possibility that he would be misled.  See Tr. of Dep. of Margaret Norton at 11, Ex. C to Doc. 19; Tr. of Dep. of Donald Tillson at 50, Ex. D to Doc. 19.  Norton then destroyed the document by running it through a shredder.

## C. **IBM's investigation of the incident and Ross's termination**

On February 12, 2004, Lockwood reported the incident with the document to her manager, June Joyce.  Joyce then informed IBM's Human Resources department, which began an investigation into whether Ross had violated IBM's Business Conduct Guidelines. IBM was concerned that Ross had violated Section 3.6 of the Guidelines, which provides that employees "must record and report all information accurately and honestly," and states that "dishonest reporting within IBM, for example to IBM management or IBM auditors . . . is strictly prohibited.  This includes not only reporting information inaccurately but also organizing it in a way that is intended to mislead or misinform those who receive it."  Business Conduct Guidelines § 3.6, Ex. H to Doc. 19.

6

Kathryn Heath, a Human Resources partner at IBM, conducted the investigation.  She interviewed Ross, Kohler, Norton, Lockwood, Tillson, and Joyce.  Heath learned from those individuals about Kohler's allegations.  She did not speak to Layton or Antonucci, nor did she have access to the allegedly falsified document, which had been shredded before her investigation began.

After conducting her investigation, Heath consulted with her supervisor, IBM's legal department, and senior management.  She then recommended that Ross be terminated for lying to an auditor, falsifying and backdating a document, and directing a subordinate to deliver it to an auditor.  IBM accepted Heath's recommendation, and Ross's second-level manager, Lyle Pirnie, informed Ross on March 15, 2004, that her employment had been terminated.

That same day, Ross requested an appeal under IBM's Open Door policy.  She subsequently spoke to Michele Geiger, a program manager in IBM's Corporate Appeals office.  Ross acknowledged to Geiger that she had created the document in question and signed it three times, but she told Geiger that in her opinion, the discipline she had received was too severe.  According to Ross, she told Geiger that she had been terminated "due to me predating on this checklist which I had all the previous data for, and that it wasn't done . . . to be dishonest, and I feel that with my 23

years of service and . . . my past record, my past experience did
not deserve this type of termination." Ross Dep. at 98.

After speaking to Ross, Geiger reviewed the Human Resources
investigation report and spoke to Heath.  Geiger concluded that
the facts were not in dispute and that the level of discipline
was appropriate under the Business Conduct Guidelines.
Accordingly, she decided that further investigation was not
warranted, and she notified Ross that her appeal had been denied.

D. **The instant action; incidents of alleged misconduct by other
IBM employees**

Following her termination, Ross brought this action against
IBM.  In Count I of her Complaint, she alleges that IBM breached
an implied contract by failing to comply with a policy of
progressive discipline, terminating her without just cause, and
denying her the appeals procedure to which she was entitled.
Count II alleges that IBM engaged in sex discrimination by
treating Ross more harshly than certain similarly situated males.

In support of her sex discrimination claim, Ross contends
that there were at least three incidents in which male IBM
employees engaged in conduct similar to hers but were not
terminated for their actions.  The first two incidents she cites
are Antonucci's creation of a checklist procedure summary for
Layton and Tillson's creation of a substitute checklist to
replace Ross's own document; both of these incidents are
described above.  The third incident on which Ross relies is an

8

alleged backdating of a document involving Tillson, Norton, and another IBM employee named Bruce Reed.

Reed testified at his deposition that his supervisors were supposed to have created a certain executive authorization letter, but they had failed to do so by the required date. When the letter was needed for an audit, Reed testified, Norton suggested that he and Tillson create a letter and backdate it to the required date. Tr. of Dep. of Bruce Reed at 8, 15, Ex. 9 to Doc. 17. He and Tillson then created and filed a backdated document. According to Reed, a few hours later, Tillson called Reed and told him that he was not comfortable with what they had done, and Reed retrieved the file and destroyed it. Id. at 27-29.

Subsequently, Reed's account of the incident came to light, and IBM conducted an investigation. Norton denied having recommended that a backdated document be created, and Tillson denied having created one. Aff. of Geoff Lind ¶¶ 8-9, Ex. K to Doc. 19. Following the investigation, Reed and Tillson were reprimanded, but they were not terminated. Id. ¶ 11.

## DISCUSSION

Currently before the Court are Ross's motion for default judgment and IBM's motion for summary judgment. The Court will consider each motion in turn.

## II. <u>ROSS'S MOTION FOR DEFAULT JUDGMENT</u>

Ross asserts that IBM engaged in spoliation of evidence by destroying the document that was at the heart of Ross's disciplinary case.  As a sanction for this alleged spoliation, Ross seeks default judgment on the issue of liability.  In the alternative, she requests either an order preventing IBM from introducing testimony regarding the destroyed document, or an instruction directing the jury to presume the relevant facts regarding the document against IBM and in her favor.

## A. <u>Legal standard for spoliation</u>

Spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999).  The Second Circuit has identified three elements that must be established to make out a claim of spoliation.  The first is that "the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed." <u>Byrnie v. Town of Cromwell</u>, 243 F.3d 93, 107 (2d Cir. 2001).  The second is that the evidence was "destroyed with a culpable state of mind." <u>Id.</u> at 109.  The third is that the destroyed evidence was relevant to the other party's claim or defense.  <u>Id.</u>  If a court finds that a party has engaged in spoliation, it has broad discretion to fashion an appropriate

sanction.  West, 167 F.2d at 779.

## B. Whether IBM engaged in spoliation sufficient to justify the requested sanctions

IBM acknowledges that its employee, Ms. Norton, shredded the document that Ross was accused of falsifying.  It argues, however, that Ross cannot satisfy the first element of a spoliation claim because IBM was under no obligation to preserve the document at the time of the shredding.  IBM also argues that with respect to the second element, it did not act with a sufficiently culpable state of mind to justify default judgment or the other sanctions that Ross has requested.

An obligation to preserve evidence normally arises when a suit has been filed, thereby giving the parties express notice that the evidence is relevant to litigation.  Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).  However, "on occasion," an obligation may arise before suit has been filed, provided that the party "should have known that the evidence may be relevant to future litigation."  Id.  Such a situation arises "where a party is on notice that litigation is likely to be commenced."  Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 73 (S.D.N.Y. 1991).

In this case, Ross has not established that IBM was on notice that litigation was likely at the time that Norton, Lockwood, and Tillson made the joint decision to destroy the document.  That decision was made before IBM even began an

11

investigation into potential misconduct by Ross, much less before it decided to terminate her.  Accordingly, at the time, it would have required a significant degree of speculation on IBM's part to predict that Ross would ultimately file a lawsuit and that the document would become relevant to that litigation.  For this reason, Ross has not shown that IBM violated an obligation to preserve the document.

Moreover, even if IBM had been obligated to preserve the document, Ross has not established that IBM acted with a sufficiently culpable state of mind to justify the sanctions she requests.  She argues that IBM's conduct justifies the drastic sanction of default judgment.  The sanctions of dismissal and default judgment are reserved for cases involving egregious misconduct, however.  Such severe sanctions "should be imposed only in extreme circumstances," and they are not appropriate absent a showing of "willfulness, bad faith, or fault."  <u>West</u>, 167 F.2d at 779.  Although the required degree of fault has not been established precisely, courts generally require the sanctioned party's conduct to rise at least to the level of gross negligence.  <u>Compare</u> <u>Cine Forty-Second Street Theatre v. Allied Artists</u>, 602 F.2d 1062, 1068 (2d Cir. 1979) (holding that the "full range of sanctions may be marshalled" in cases of gross negligence), <u>with</u> <u>Sec. & Exch. Comm'n v. Research Automation Corp.</u>, 521 F.2d 585, 588 (2d Cir. 1975) (holding that the sanction of default judgment under Rule 37(b) cannot be imposed

due to mere negligence).

In the Court's view, even if IBM should have preserved the document, its failure to do so was not sufficiently "extreme" to require the drastic sanction of default judgment.  There is no evidence to suggest that its employees acted with gross negligence or willfulness.  Norton and Tillson have stated that they acted out of the good-faith motive of ensuring that Layton would not be misled, and Ross has not presented any evidence to cast doubt on this motive.

As an alternative to default judgment, Ross seeks either an instruction to the jury to presume the relevant facts against IBM or an order precluding IBM from offering testimony by Kohler and Norton about the destroyed document.  Ross has not drawn the Court's attention to other cases in which these sanctions have been imposed, and the Court is not persuaded that they would be justified by IBM's conduct in this case.  By ordering the jury to presume certain facts or by excluding evidence that is obviously relevant, the Court would risk trespassing on the jury's role as factfinder.  At trial, the jury will be free to consider the fact that IBM shredded the document, and Ross may seek to persuade the jury that IBM did so because it had something to hide or because Kohler's allegations were less than truthful.  The Court declines, however, to impose sanctions that would compel the jury to reach particular conclusions.  As Ross herself points out, the requested sanctions could be tantamount to issuing a default

judgment in her favor, see Mot. for Default J. at 19-20, and the Court has determined that such a severe sanction is unwarranted.

For the above reasons, the Court will deny Ross's motion for default judgment and other sanctions.

### III. IBM'S MOTION FOR SUMMARY JUDGMENT

IBM moves for summary judgment on all claims of the Complaint.  It argues that it is entitled to summary judgment on Ross's implied contract claims because the undisputed facts demonstrate that it did have just cause to terminate Ross, it was under no obligation to provide progressive discipline, and it afforded her the proper appeals process.  With respect to the sex discrimination claim, IBM argues that Ross has failed to establish a prima facie case of sex discrimination and that she has failed to adduce evidence that IBM's stated reason for her discharge was a pretext for discrimination.

### A. Legal standard for summary judgment

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  A court may not grant summary judgment if a disputed fact exists that might affect the outcome of the suit under controlling substantive law.  Id. at 248.  The burden is on the moving party

to demonstrate the absence of a genuine issue of material fact, and in considering the motion, the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party.  <u>Gallo v. Prudential Residential Servs. Ltd. P'ship</u>, 22 F.3d 1219, 1223 (2d Cir. 1994).  The nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

**B. <u>Ross's implied contract claims</u>**

In Count I of the Complaint, Ross asserts that IBM breached its obligations under an implied contract, created by IBM's employment policies and practices, to provide Ross with progressive discipline, to terminate her only for just cause, and to provide her with a certain appeals procedure.  IBM argues that there are no issues of material fact with respect to any of the alleged breaches, and that it is entitled to judgment as a matter of law on all of the contract claims.

1. <u>Ross's entitlement to progressive discipine</u>

The Complaint asserts that IBM had a policy of "progressive discipline" under which each employee was entitled to "notice of shortcomings in the employee's performance and an opportunity to cure those job performance shortcomings[.]"  Compl. ¶ 5.  It alleges that by terminating Ross without providing notice or an opportunity to cure, IBM bypassed this policy, thereby violating its implied contract with her.  <u>Id.</u> ¶ 17.  IBM argues, however,

15

that Ross has failed to substantiate the existence of such a
policy.

Indeed, Ross has not submitted any evidence regarding the
existence of a progressive discipline policy.  She testified at
her deposition that she had a written procedure in her office
providing for progressive discipline, Ross Dep. at 128, but she
has not submitted a copy.  Nor do Ross's legal memoranda direct
the Court to any evidence that might substantiate her claim of
entitlement to progressive discipline.  For these reasons, there
are no issues of material fact that could support Ross's
progressive discipline claim, and the Court will grant summary
judgment for IBM with respect to that claim.

2. <u>Whether IBM had just cause to terminate Ross</u>

Ross alleges that IBM committed a breach of implied contract
by terminating her without just cause.  Compl. ¶¶ 5, 17.  IBM
indicates that it is unwilling to concede the existence of an
implied contract to terminate only for just cause.  Mem. in
Support of Mot. for Summ. J. at 10 n.1.  It does not argue this
point, however, relying instead on the argument that it had just
cause to terminate Ross.  <u>Id.</u> at 10.  Accordingly, for purposes
of determining whether IBM is entitled to summary judgment, the
Court will assume that IBM was permitted to terminate Ross only
for just cause.[1]

_____

[1] Under Vermont law, at will employment may be modified to create
an implied contract to terminate only for just cause.  In

16

The Vermont Supreme Court has defined "just cause" as "some substantial shortcoming detrimental to the employer's interests, . . . which the law and a sound public opinion recognize as a good cause for [the employee's] dismissal." Dulude v. Fletcher Allen Health Care, Inc., 174 Vt. 74, 80, 807 A.2d 390, 396 (2002). "The ultimate criterion of just cause is whether the employer acted reasonably in discharging the employee because of misconduct." Id.

While there is no dispute over this basic criterion of reasonableness, the parties propose competing standards by which, in their view, the Court should measure the reasonableness of IBM's decision. Ross invites the Court to apply the so-called "Colleran-Britt" factors, set forth in Grievance of Colleran & Britt, 6 V.L.R.B. 235, 236 (1983). IBM argues, however, that these factors should not apply, and it proposes that the Court analyze whether IBM acted reasonably by considering whether it had a good faith belief, based on its investigation, that Ross violated its Business Conduct Guidelines. In IBM's view, it is irrelevant whether Ross actually committed misconduct by violating the Guidelines, as long as IBM reasonably believed that she did.

---

determining whether such a modification has occurred, courts "look to both the employer's written policies and its practices." Dillon v. Champion Jogbra, Inc., 175 Vt. 1, 5, 819 A.2d 703, 707 (2002). Because this issue is not raised by the instant motion for summary judgment, however, the Court expresses no opinion as to whether such a modification occurred in Ross's case.

17

There is a split of authority as to how much deference the factfinder must give to an employer's determination that misconduct has occurred.  One line of cases holds that "[w]here the employer claims that the employee was discharged for specific misconduct . . . and the employee claims that he did not commit the misconduct alleged, the question is one of fact for the jury: did the employee do what the employer said he did?" Toussaint v. Blue Cross & Blue Shield, 292 N.W.2d 880, 896 (Mich. 1980).  IBM, by contrast, urges the Court to follow a competing line of cases that holds that the proper question is not whether the misconduct actually occurred, but rather whether "the factual basis on which the employer concluded a dischargeable act had been committed [was] reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual[.]" Cotran v. Rollins Hudig Hall Int'l, Inc., 948 P.2d 412, 422 (Cal. 1998).

As this Court noted in Raymond v. International Business Machines Corp., 954 F. Supp. 744, 751 (D. Vt. 1997), the Vermont Supreme Court has not definitively adopted either position.  In Raymond, the Court predicted that Vermont would follow Toussaint and permit the jury to determine whether an employee had actually engaged in misconduct.  Id. at 752.  This conclusion has arguably been cast is some doubt, however, by the Vermont Supreme Court's subsequent allusion to a standard of "objective good faith," a phrase that is often associated with the Cotran position.  See Dulude, 174 Vt. at 81, 807 A.2d at 396 (indicating that the

18

employer's decision is measured according to a standard of "objective good faith"); see also Raymond v. Int'l Bus. Machines Corp., 148 F.3d 63, 67 (2d Cir. 1998) (framing the inquiry as whether the employer "lacked a reasonable, good faith belief that plaintiff had engaged in misconduct."). It is also unclear whether Vermont courts would apply the Colleran-Britt factors in a case such as this that does not involve a state employee.

For present purposes, it is unnecessary to determine which standard Vermont courts would apply, because even under the standard that IBM proposes, summary judgment is not appropriate. In Cotran, the court emphasized that "[a]ll of the elements of the governing standard are triable to the jury," Cotran, 948 P.2d at 422, and there is no basis for concluding that Vermont courts would follow a different rule. Hence, IBM is not entitled to summary judgment as long as there is an issue of material fact as to whether "the factual basis on which the employer concluded a dischargeable act had been committed [was] reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual[.]" Id.

Applying this standard, the Court is unable to conclude that IBM's decision was reasonable as a matter of law. The record discloses several factors which, taken together, could permit a jury to infer that IBM's investigation was insufficiently thorough and that its decision was arbitrary or pretextual.

First, IBM conducted its investigation and concluded that

19

Ross had engaged in misconduct without the benefit of a central
piece of evidence: the allegedly falsified document.  As
discussed above, IBM was not necessarily under an obligation to
preserve the document.  However, a jury could reasonably conclude
that IBM's failure to do so compromised its investigation of
Ross.  Although Ross concedes that she signed the document three
times, she maintains that its layout and the manner in which it
was signed would have refuted IBM's conclusion that she created
it with an intent to mislead.  For example, if the document was
signed in only one color, as Ross contends, that would cast doubt
on the credibility and allegations of Ms. Kohler, who accused
Ross of engaging in intentional deception by signing in three
different colors.  By destroying the document, IBM deprived its
investigator, Ms. Heath, of the ability to consider this
potentially exculpatory evidence.

     In addition, Ms. Heath failed to interview certain key
individuals and apparently failed to clarify whether Layton was
actually seeking a pre-existing checklist.  Ross maintains that
Layton never asked for a checklist that was already in existence;
he merely wanted documentation showing the procedures that had
been followed in the past.  This distinction is important,
because if Layton had specifically asked for a pre-existing
document, that would have given substantial weight to IBM's
conclusion that Ross intended to mislead him.  By contrast, if
Layton was not concerned with whether the document was already in

existence, it would be irrelevant whether Ross created that
impression.  Yet despite the importance of this fact, Heath
testified that she never asked Layton whether he was seeking a
document already in existence.  In fact, Heath testified that she
"did not speak with Scott Layton directly" at all.  Tr. of Dep.
of Kathryn Heath at 80, Ex. E to Doc. 19.  She also failed to
speak with Mr. Antonucci, the Non-Product Crib manager who
received an identical request from Mr. Layton and who could have
shed more light on what Layton was actually looking for.

Heath's notes suggest, in fact, that her investigation
disclosed that Layton was merely seeking evidence of a process
and that he was not necessarily looking for a pre-existing
document:

> Q: Okay.  The very first paragraph, the second sentence
> says, "during this routine audit inquiry, Scott Layton
> asked Jodie Ross for a copy of the department's desk
> procedure root cause analysis of RIC errors," do you see
> that?
> A: Yes.
>
> . . .
>
> Q: Does it say it had to be an existing document, that it
> was already in existence?
> A: It doesn't say that, that is what he was looking for.

Id. at 76-77.  Heath's notes also suggest that Ross undertook to
provide evidence of a process or procedure, but not to provide
him with an actual pre-existing document:

> Q: All right.  And then the next line it says, "Jodie –
> have process would get it to him."
> A: Yes.  So Peggy was describing to me what she understood
> had transpired during the meeting between Jodie Ross,

21

> Scott Layton and Bette Kohler.
> Q: Now, I want to just stop you there.  She said what you
> wrote down there is she said "Jodie - have process would
> get it to him," it doesn't say "have document will get it
> to him," it says, "have process;" correct?  That's what
> you wrote down?
> A: That is what I wrote down.

Id. at 67.

In short, the evidence raises a question of material fact as
to whether the decision to terminate Ross was based on a
sufficiently thorough and appropriate investigation.  Heath
recommended that Ross receive the drastic punishment of
termination without having reviewed the allegedly falsified
document; without talking to Layton, the auditor who was
allegedly misled; and without clarifying whether Layton was even
seeking a pre-existing document.  Although a jury could reach the
conclusion that the investigation was sufficient notwithstanding
these deficiencies, the Court is unable to make that
determination as a matter of law.  Accordingly, IBM is not
entitled to summary judgment on Ross's claim that she was
terminated without just cause.

3. Whether IBM violated Ross's right to internal grievance and
   appeals procedures

Ross also alleges that IBM committed a breach of implied
contract by denying her "the internal grievance and appeals
procedures provided for in its policies to contest [her]
termination."  Compl. ¶ 18.

However, IBM provides evidence that Ross did participate in

22

IBM's internal appeals process and that IBM complied with the applicable procedures.  After being discharged, Ross called the Corporate Appeals office and requested an Open Door appeal. Michele Geiger, the program manager, spoke with Ross and reviewed the files relating to her case.  Geiger then concluded that the discipline imposed was appropriate and closed the appeal.  As IBM points out, Geiger's decision not to open a formal investigation complied with IBM's appeals procedure, which provides:

> [W]hen an Open Door is requested, the individual responsible for the process decides if a full-fledged investigation is required. . . . There are instances when such a formal process is unnecessary.  Based on the issues and facts presented by you, there may be enough information to give you an answer without meeting you or requiring a structured investigation.

Pl.'s Disclosure at 000042, 000081.

In her opposition to IBM's summary judgment motion, Ross does not provide any evidence to refute IBM's assertions. Accordingly, the court will grant IBM's motion with respect to Ross's claim that she was denied the proper grievance and appeals procedures.

## C. Ross's sex discrimination claim

Ross alleges that in terminating her, IBM engaged in sex discrimination in violation of the Vermont Fair Employment Practices Act ("FEPA"), Vt. Stat. Ann. tit. 21, § 495.  Compl. ¶ 20.  She bases her claim chiefly on the assertion that certain similarly situated male IBM employees engaged in comparable misconduct without being subjected to termination.

23

Ross has not presented direct evidence of unlawful discrimination.  In the absence of such evidence, Vermont courts analyze FEPA sex discrimination claims according to the three-step analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Boulton v. CLD Consulting Eng'rs, Inc., 175 Vt. 413, 421, 834 A.2d 37, 44 (2003).  The analysis proceeds as follows:

> This framework requires plaintiff to make an initial showing of circumstantial evidence creating a presumption of illegal discrimination by the defendant.  The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  If the employer meets this burden of production, the final stage of the analysis shifts the burden of production back to plaintiff to prove by a preponderance of the evidence that the legitimate reasons given by the employer are a pretext for discrimination.

Id. (citations omitted).

1. Whether Ross has established a prima facie case

To advance beyond the first stage of the McDonnell Douglas analysis, the plaintiff must establish a prima facie case of discrimination.  The Vermont Supreme Court has emphasized that "Plaintiff's burden of proof in the prima facie case is minimal. . . . The Court of Appeals for the Second Circuit has repeatedly called it 'de minimis.'"  Boulton, 175 Vt. at 421, 834 A.2d at 44 (quoting Carpenter v. Cent. Vt. Med. Ctr., 170 Vt. 565, 566, 743 A.2d 592, 595 (1999)); see also Robertson v. Mylan Labs., Inc., 176 Vt. 356, 367, 848 A.2d 310, 320 (2004) ("The evidentiary burden required of the plaintiff at this stage is a relatively

24

light one.").

To establish a prima facie case, Ross must demonstrate that "(1) she was a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding this adverse employment action permit an inference of discrimination." Robertson, 176 Vt. at 367, 848 A.2d at 321.  IBM does not dispute that Ross has satisfied the first three factors, but it argues that she has not adduced evidence to support the fourth factor.

A plaintiff may demonstrate an inference of discrimination sufficient to meet the fourth factor by showing "that she was treated differently from a similarly situated male employee." Boulton, 175 Vt. at 423, 834 A.2d at 45.  Ross cites three occasions on which male employees engaged in conduct similar to hers but were not terminated.  First, she notes that when Antonucci received Layton's request for a procedure summary, he created a document that had not previously existed and that was labeled with a potentially misleading date.  Second, she notes that Tillson engaged in similar behavior when he created a substitute document to replace the one Ross had created.  Third, she cites an occasion on which Tillson and another employee, Bruce Reed, created and backdated a document.

IBM argues that these male employees were not similarly situated to Ross because their misconduct was less serious than hers.  Vermont case law suggests, however, that arguments

25

regarding the precise degree to which employees are similarly situated are more appropriately addressed in the rebuttal and pretext stages of the McDonnell Douglas analysis.  For example, in Robertson, the court held that the plaintiff was not required at the prima facie stage to demonstrate that she was more qualified than the man who was hired in place of her.  Robertson, 176 Vt. at 369, 848 A.2d at 322.

Bearing in mind that Ross's burden of production is minimal at this stage, the Court concludes that Ross has established a prima facie case.  She is a woman; there is no dispute that she was qualified for her position; she was involuntarily terminated; and male employees who engaged in conduct similar to hers were treated less harshly.  Cf. Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996) (holding that the plaintiff made out a prima facie case "by showing that she is a member of a protected class, a black female; that she applied for the positions; that she was qualified for the positions; and that the positions were filled by a white male and a white female").

2. IBM's nondiscriminatory reason for the termination

Because Ross has established a prima facie case of discrimination, IBM must articulate a nondiscriminatory reason for the adverse employment action.  Once again, IBM relies on the argument that it terminated Ross based on its belief that she had violating the Business Conduct Guidelines by lying to an auditor and falsifying a document.

26

At the second stage of the <u>McDonnell Douglas</u> analysis, the employer has "only a burden of production, rather than one of persuasion." <u>Robertson</u>, 176 Vt. at 370, 848 A.2d at 323.  The court "may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom." <u>Id.</u> at 372, 848 A.2d at 325.  Accordingly, IBM need not establish at this stage that the termination was justified; it must merely proffer evidence which, if believed, would demonstrate that it terminated Ross for a legitimate and nondiscriminatory reason.  <u>Id.</u>

The Court is satisfied that IBM has met its burden.  The testimony of Kohler and other witnesses supports the notion that IBM believed Ross had violated the Guidelines.  Regardless of whether that belief was reasonable, it qualifies as a nondiscriminatory reason for Ross's termination.

3. <u>Whether IBM's stated reason was a pretext</u>

Because IBM has furnished a nondiscriminatory reason for terminating Ross, the burden returns to Ross.  IBM will be entitled to summary judgment unless Ross can establish that there is an issue of material fact as to whether IBM's stated reason was merely a pretext for discrimination.

Ross's claim of pretext rests on the same assertion she used to establish her prima facie case: that IBM treated her more harshly than male employees who engaged in similar conduct. Evidence that similarly situated men were treated differently can support a claim of pretext.  <u>See, e.g.</u>, <u>Boulton</u>, 175 Vt. at 423,

27

834 A.2d at 45 (noting that for the plaintiff "[t]o survive summary judgment, other employees with whom the plaintiff compares herself must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.") If the allegation is that the male employees were not disciplined as harshly, the plaintiff must show that she and the men "engaged in misconduct of comparable seriousness." In re Butler, 166 Vt. 423, 431, 697 A.2d 659, 665 (1997). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Id.

The first two incidents cited by Ross relate to the checklist summaries prepared by Antonucci and Tillson. The Court agrees with IBM that standing alone, these incidents are not comparable to Ross's alleged misconduct. Like Ross, Antonucci and Tillson prepared documents for Layton that had not previously existed, and it is conceivable that Layton might have been confused as to when those documents were created. Both men, however, placed the current date on their documents, while Ross's document was backdated in a manner that was arguably more likely to mislead an auditor into thinking it had existed for over three years. Regardless of whether Ross actually violated the Business Conduct Guidelines, it is evident that her actions had more potential to mislead and were more likely to have violated the

Guidelines than Antonucci and Tillson's conduct.  Ross is free, of course, to argue to a jury that IBM's treatment of Antonucci and Tillson provides additional evidence of IBM's bias against women.  For present purposes, however, their conduct is not sufficiently comparable to Ross's to satisfy the pretext requirement.

The incident involving Reed and Tillson, on the other hand, was more comparable to the Ross incident.  As described above, Reed testified at his deposition that after his supervisors failed to create a certain document by the required date, he and Tillson created and filed a backdated version of the document for use in an audit.  When IBM became aware of the incident, Reed and Tillson were reprimanded, but not terminated.

The Court agrees with Ross that the conduct described by Reed was of comparable seriousness to Ross's alleged misconduct. Both cases involved the backdating of a document that was needed for an audit.  Both cases involved misleading activity that represented a potential violation of Section 3.6 of the Guidelines.  And in both situations, there was a factual dispute as to whether the individuals actually engaged in misleading activity.

IBM suggests that Reed and Tillson's actions were less serious than Ross's because Tillson became uncomfortable with what he had done and corrected his mistake.  However, Ross was not given an opportunity to correct her mistake; her document had

already been destroyed and replaced by the time that she returned to work.  Furthermore, Ross is not required to demonstrate "precise equivalence in culpability between employees."  Butler, 166 Vt. at 431, 697 A.2d at 665.  Because the two incidents are at least "roughly equivalent," id., Ross has met her burden.

IBM also argues that because Norton, a woman, was implicated in the incident with Reed and Tillson, Ross cannot rely on that incident to show an inference of discrimination.  This argument is not persuasive.  Norton was not actually involved in the creation of the backdated document; it was Reed and Tillson who actually engaged in the conduct similar to Ross's.  In addition, a jury could conclude that IBM treated the entire incident less seriously because two men were involved.  The fact remains that Ross, a woman, was treated more harshly than two similarly situated men, and this evidence is sufficient to raise an issue of material fact with respect to whether IBM's stated reason for terminating Ross was a pretext for discrimination.

In determining whether the employer's stated justification was a pretext, a court may take into account not only evidence of disparate treatment, but also the weakness of the stated reason. See Byrnie, 243 F.3d at 102 ("A motion for summary judgment may be defeated where a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").  Having concluded

30

above that there are issues of material fact regarding the reasonableness of IBM's decision to terminate Ross, the Court must take this factor into account in determining whether there are issues of material fact as to whether IBM's stated reason is a pretext.

The doubts outlined above as to the thoroughness of IBM's investigation, combined with Ross's evidence that she was treated more harshly than similarly situated males, could permit a jury to infer that IBM's true motive in terminating Ross was discriminatory.  Accordingly, IBM is not entitled to summary judgment on the sex discrimination claim.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, Ross's motion for default judgment is DENIED.  IBM's motion for summary judgment is GRANTED with respect to Ross's claims of denial of progressive discipline and denial of the proper appeals procedure.  IBM's motion is DENIED with respect to Ross's claims of termination without just cause and sex discrimination.


Dated at Burlington, Vermont this 24th day of January, 2006.


                                    /s/ William K. Sessions III
                                    William K. Sessions III
                                    Chief Judge

31